DELLA THOMAS GREEN et al., Appellants, v. O. D. ELLSWORTH, Executor, et al., Appellees.

No. 43471.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

JUNE 19, 1936.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Guy A. Miller, for appellants.

Russell K. Craft, for appellees.

RICHARDS, J.—This law action was brought to set aside the probating of the will of one R. R. Wilson, deceased, on the ground that decedent was a person of unsound mind and incapable of making a will at the time of the execution of the instrument. At the close of plaintiffs' evidence, defendants moved for a directed verdict, on the ground that plaintiffs had not introduced evidence sufficient to warrant submitting the issue to the jury. The motion was sustained, judgment was rendered against plaintiffs, and therefrom they have taken this appeal. The only question presented is whether there was error in the sustaining of the motion.

The alleged will was executed on February 3, 1930, decedent being then a few months past eighty-eight years of age. He died in January, 1934. His estate consisted of an eighty-acre farm in Dallas county, some lots in Waukee, $2,000 of county road bonds, forty-two shares of 6 per cent stock in a power company, a $500 Liberty bond, and money on deposit and in certificates of not large amount. Decedent was a pensioner of the United States government, and from that source he derived a considerable increment of his estate. For many years prior to 1904, he had lived on and farmed the 80 acres. At this farm

home decedent and his wife reared their family of three sons and four daughters. In the spring of 1904, the land was rented to the son Charles, and decedent and his wife and two unmarried daughters, Susie and Genarie, removed to the town of Waukee and into a large residence which decedent had constructed at about that time. The title to the residence was in decedent's wife. From 1904 until 1929, the family consisted of decedent, his wife, and the two unmarried daughters, excepting that for considerable periods the daughters were away, working as domestics. The wife died in 1929 and thereafter until decedent's demise the family consisted of himself and the two mentioned daughters. The record indicates that decedent was a man of meager education. He could read and write, but always experienced difficulty in even simple calculations involving multiplying or dividing figures and amounts. During his entire life he relied more or less upon others to compute his business transactions or to verify the calculations he himself made. The son Charles conducted all the business and attended to all the details connected with the building of the home in Waukee in 1904. Through his lifetime decedent exhibited not more than mediocre ability or mentality. He was small of stature and considering his advanced age retained well his physical health until his death. At the time the will was made and thereafter until his death his method of life included a measure of light work in the garden, daily walks to various places in the small town of Waukee, together with the habit of sleeping an unusually large part of the daytime. When the will was made, there had been an undoubted recession of his mental powers and energy. Two years previously he had turned over to an agent, one Ellsworth, the management of the farm. However, decedent, until his death, continued transacting the business of depositing his pension checks, and collecting interest on certificates of deposit, although the daughter Susie frequently accompanied and assisted him. At the time of the making of the will, he had adopted the practice of having the daughter draw all necessary checks and the habit of signing his name by mark although he could write his name. There is considerable evidence that before the will was executed decedent had in his home a number of toys, appropriate for small children, and that he would exhibit these toys with an apparent interest and pleasure, but without permitting any children to use them in play. The element of

childishness on part of decedent that might be drawn therefrom is somewhat lessened by the fact that among these toys was a small horn, a gift from a very young grandchild. The horn seems to have been the most highly prized of the collection, quite possibly on account of its association in the mind of decedent. Before the will was executed, there had developed in decedent a noticeable practice of repeating questions and repeating his own remarks. The topics of his conversation with others pertained largely to his former acquaintances and the locality of the home farm, and during visits with various witnesses, after making some inquiry about some subject, he would repeat the question during a later part of the conversation and would listen again to the answer. In this connection the evidence discloses that decedent's sense of hearing was considerably impaired. Likewise if he had observations of his own to make he would frequently repeat them in the same conversation. The two daughters living in the home exercised considerable authority over decedent particularly in restraining him from activities apparently too strenuous for one of such advanced age. At times this resulted in considerable disagreement on part of decedent, and aroused his anger, exhibited by his mumbling and muttering his displeasure, and at times by his refraining from speaking to the daughters for a day or two. In 1908 decedent bought a share of stock in a local elevator and when in 1928 the charter was renewed there was allocated to decedent an additional share. Thereafter he had two or three conversations with the company manager expressing the thought that he should have interest on his money, saying that he had just as well get the cash if he could not get any returns. But a careful reading of the record in this respect might easily lead to the conclusion that decedent fairly understood his investment and was maneuvering for a means of withdrawal of funds from an unprofitable venture. Two twin grandchildren, thirteen years old, testified that they made visits to decedent nearly every summer and upon their arrival decedent apparently did not know or recognize them, indicated by the fact that he made inquiry of Susie and Genarie as to their identity. There is evidence decedent through forgetfulness would feed the cow a second time. There is evidence that when grandchildren discussed Christmas presents desired by them decedent's statement was that he had no money. There is evidence that decedent found pleasurable amusement in the

impression in the mind of a child in the neighborhood that he, decedent, was Santa Claus, and apparently decedent encouraged the child so to believe, promising that he would make him Christmas presents. Decedent in no way redeemed his promise.

All must appreciate the difficulty in the trial of an issue such as was in this case, to present through the medium of witnesses the definite picture of a mental condition that is apparent to one having actual contact and observation. Nor is it an easy task to set out, as we have attempted, a complete statement of the evidence. But having set it out as best we can, our prior holdings compel the conclusion that the court did not abuse its discretion in sustaining the motion. There was no evidence that decedent possessed any insane delusions with respect to any of the natural recipients of his bounty, nor apparently was there sufficient directly bearing evidence to make controversial the questions whether decedent had mental capacity sufficient to comprehend the nature of the instrument he was executing, or to recollect the property he meant to dispose of, or to recollect the natural recipients of his bounty, or to know the manner in which he desired to dispose of his property. Examination of the instrument itself adds but little if any weight to contestant's position. The will appointed a trustee during the lifetime of the two unmarried daughters, benefiting them to the extent of the income, with distribution to the grandchildren upon the decease of the two daughters. It is true four other children of decedent were living and one child was dead leaving issue. But there is no evidence as to the financial status of the four children, nor of any facts peculiar to their condition in life that would make the manner of disposition particularly unreasonable or unnatural. In Re Estate of Fitzgerald, 219 Iowa 988, 259 N. W. 455, the quantum of showing necessary to take to the jury the issue that is in this case having been recently reviewed, no good purpose would be served by repetition in this opinion.

The judgment below must be affirmed.—Affirmed.

DONEGAN, C. J., and ANDERSON, KINTZINGER, MITCHELL, PARSONS, STIGER, HAMILTON, and ALBERT, JJ., concur.