# SUPREME COURT

OF THE

## STATE OF IOWA

AT

## DES MOINES, JANUARY AND MAY TERMS, 1918

———————

JOHN S. MONAHAN et al., Appellants, v. ROSE RODERICK
et al., Appellees.

**WILLS:** Probate, Establishment and Annulment—Undue Influence
1 —Jury Question. Evidence concededly presenting a jury ques-
tion on the issue of testator's mental competency to execute a
will, may strongly influence the submission of the issue of un-
due influence.

**EVIDENCE:** Opinion Evidence—Conclusions—Wills—Influence Over
2 Testator. It is error to permit a contestant to state that pro-
ponent had great influence over testatrix, yet nonprejudicial
when the fact of such influence abundantly and without con-
troversy appears from other portions of the record.

**TRIAL:** Reception of Evidence—Order of Proof—Belated Offer—
3 Wills. Evidence that contestant had defrauded testatrix may
be admissible as bearing on the reason for ignoring contestant

in the will, and as rebutting the plea of undue influence; yet such evidence is properly rejected when withheld by proponent until the surrebuttal of the case.

APPEAL AND ERROR: Presentation and Reservation of Grounds—
4 Exceptions—Waiver. He who duly excepts to the refusal of the court to receive evidence on a certain subject-matter, waives any error in such ruling by failing to enter any objections to an instruction which informs the jury that such subject-matter is wholly immaterial to the issues in the case.

EVIDENCE: Opinion Evidence—Nonexpert Witness—Insufficient
5 Detail of Facts—Wills. It is not prejudicial error to permit a nonexpert witness, on an insufficient detail of facts, to give an inconsequential opinion as to the soundness of mind of a person.

EVIDENCE: Opinion Evidence—Nonexpert Witness—Detail of
6 Facts—Sufficiency. The detail of facts which will qualify a nonexpert witness to give an opinion as to the unsoundness of mind of a person, is sufficient, if such detail is as to matters somewhat out of the ordinary, and of a nature such as to attract attention to the mental condition of the person in question.

EVIDENCE: Opinion Evidence—Physicians—Opinion without De-
7 tail of Facts. A physician, though not an expert in mental diseases, may, without a detail of facts, give his opinion as to the mental soundness of a person professionally treated by him.

*Appeal from Polk District Court.*—CHAS. A. DUDLEY, Judge.

MARCH 12, 1918.

THIS is a contest over the will of Ann Monahan. The proponents are two sons of the testatrix, and the contestants, two daughters. There was a verdict for the contestants. The proponents have appealed.—*Affirmed.*

*Cummins, Hume & Bradshaw, Hugh Brennan,* and *Frank T. Jensen,* for appellants.

*J. H. Patton,* for appellees.

EVANS, J.—I. The activities of the litigation and of the trouble leading up thereto have been conducted mainly by

John S. Monahan, for the proponents, and by Rose Roderick for the contestants. The testatrix died at Des Moines, in January, 1916. The will under contest was made June 29, 1915. The property involved consists, in the main, of a 200-acre farm in Adair County, where the testatrix had lived for many years. She was over eighty years of age at the time the will was made. She was of strong character in her day, but was unlearned, and unable to read and write. She had been a widow for some years prior to her death. She had six children: Tom, William, Peter, John, Rose, and Mary.

The contest of the will was based upon two grounds: (1) That the testatrix was mentally incompetent to make a will; (2) that she was unduly influenced, more particularly by her son John S. Monahan. Both issues were submitted to the jury, and a general verdict rendered in favor of the contestants. In April, 1915, a guardian had been appointed for the testatrix, and the guardianship was in force up to the time of her death.

The first ground of reversal urged by the appellants is that there was no evidence of undue influence, and that such issue should not have been submitted to the jury. It is conceded that there was sufficient evidence to go to the jury on the question of mental competency, and especially in view of the presumption obtaining by reason of the guardianship proceeding. In January, 1915, the testatrix had made a will, whereby she devised her property equally among her six children, who were, at that time, all living. Her son William was under guardianship in another part of the state, and account of that fact was taken in making provision for him. Her son Tom lived in Polk County. John lived in Seattle, Washington, and Peter, in Canada. The daughter Rose lived in Polk County, and the daughter Mary in Adair County. For some years, the testatrix and her son Tom had made their home with the daughter Rose, in Des

Moines. The son Tom looked after his mother's business, and aided her in all necessary ways. More or less aid was also rendered by the daughter Rose. In the spring of 1915, the son Tom became sick, and died from his illness on May 13th. The son John left home about twenty years ago. He was for four years in the navy, and sailed the world. Afterwards, he took up his residence at Seattle, Washington, and engaged in various occupations there, being at last a member of the fire department of that city. He made occasional visits to his mother. About the first of April, 1915, he visited her at the Roderick home. This was at the time of Tom's illness, and such illness was partly the occasion for the visit. John's own evidence, as a witness, shows him to have been aggressive in temperament, and very suspicious of his sister Rose. He had been quite active in correspondence in demanding from her information as to the state of his mother's affairs, and had been quite resentful at the meagerness of the information received. The following, quoted from his own testimony in chief, is illustrative of much that transpired between him and his sister, which culminated in the will of June 29, 1915.

"Before this time, Rose and I had a quarrel through a letter. They claimed they were going to keep it for evidence against me. I hope they do. That was before I came home this last time, with reference to the affairs of my mother. Exhibit No. 3 and Exhibit No: 3-A are a letter written to me by my sister Mrs. Roderick, with reference to what I had been asking,—a letter as to what was going on. I asked Mrs. Roderick some question which she did not answer. This letter, Exhibit No. 3, will refer to a couple of letters dated some time earlier, where I intended to show that I asked questions which I did not think were answered when they should have been. Rose had not been answering letters as I thought she should, and I was suspicious that she was not telling mother what I wanted her to; so I wrote a letter

to Miss Mame Curry (her name is Mrs. Frankson now). Inside, I had a letter addressed to mother, and I asked her to read mother that letter, and to get mother's answer and write me. Some way, Mrs. Roderick got the letter, and Exhibit 3 is her answer back. In this letter I wrote to mother through Mame Curry, I asked who was doing mother's business, and asked concerning some money she had,—how much money she had in the bank. I think the letter was dated about the fore part of December, 1914, and I said that I was suspicious that there was some crooked business going on; that I could not accuse anybody of doing anything out of the way, but Rose had not answered my letters promptly to the questions that I asked, and I thought I was entitled to know that."

He arrived at his sister's home on the first of April, and spent several days there. He accused her freely of wrongful conduct, professed his suspicions, demanded explanations, and accepted none. He rented a house for his mother in another part of the city, and he and his mother occupied the same for nearly three months. They left the Roderick home about the 7th or 8th of April. According to his testimony, he took charge of his mother's business; he found the balance in the bank too small; he found many checks which he could not understand, and which his mother did not understand. He talked bitterly concerning his sister to his mother; he asked her about her will and asked her to send to Adair County for it. The will under consideration was made June 29, 1915, by a reputable attorney. John was not present when it was made. Its provisions gave the property to the four children other than Rose. On July 1st, mother and son started on a trip to Canada to the home of Peter, where John left her and returned to Seattle. The testatrix stayed at Peter's home until December, when she returned to Des Moines, and died there, a month later. The foregoing is a mere outline of what appears from the tes-

timony of the proponent John. There are many other details, upon which we cannot dwell. Sufficient to say that we think the evidence was sufficient to justify a submission to the jury of the question of undue influence. And this is especially so because of the conceded sufficiency of the evidence to show mental weakness. Conduct which might be insufficient to unduly influence a person of mental strength might be sufficient to so operate upon a failing mind. That John had the willing spirit in that direction is beyond debate, upon this record. The fact of undue influence must largely be proved, as a rule, by circumstantial evidence. There are too many significant circumstances in this case to have warranted a directed verdict for the proponents on that issue.

1. WILLS: probate, establishment and annulment: undue influence: jury question.

II. The witness Rose Roderick was permitted to testify as follows:

2. EVIDENCE: opinion evidence: conclusions: wills: influence over testator.

"Q. What is the fact, Mrs. Roderick, as to the kind of influence Jack (John) had in regard to your mother, whether great or small? A. Well, certainly it was great."

This question was objected to, as asking for a conclusion of the witness; and the objection was overruled. Complaint is now made of such ruling. It is strongly urged that the answer of the witness was a mere opinion or conclusion on her part. We are disposed to the view that the appellant's point is well taken. In the state of this record, however, the point is entirely technical, and without prejudice. The border line between fact and conclusion is not very well defined. Facts, so called, usually involve some degree of opinion and conclusion. Naturally, the border line questions are troublesome. The question here is close to the border line. The form of the question is, of course, less objectionable than if it had asked whether John had influenced his mother to do a particular act. Upon the record

in this case, it appears, practically without dispute, from the testimony of both sides, including that of the proponent as a witness, that he did have great influence upon his mother. This is not saying that it was sinister or wrongful. Neither did the question objected to imply that. Concededly, the mother turned over to John all her business, stated to various persons that she had done so, and trusted him implicitly. The fact, therefore, that this witness was permitted to say that John had great influence over his mother, added nothing substantial to the evidence, and could not fairly be deemed prejudicial, in any sense.

III. The proponent called John S. Monahan in surrebuttal. The following occurred:

3. TRIAL: reception of evidence: order of proof: belated offer: wills.

"Q. What do you know, if anything, about your mother getting the money on those checks you have testified to? (Objected to by contestants as not surrebuttal. Objection sustained. Proponents except.)"

Later, during the examination of the same witness, the following occurred:

"Mr. Gwin: Now we offer, read, and introduce in evidence the checks from 5 to 45, inclusive.

"Mr. Patton: They are objected to as not surrebuttal, incompetent, irrelevant, and immaterial.

"The Court: You may offer and read in evidence those checks which he identified as the checks which he showed Mrs. Roderick that morning.

"Mr. Fagan: Exhibits 29, 38, 35, 33, 23, 20, 14, 16, 25, 19 and 22; also Nos. 5 and 13.

"The Court: Those may be offered in evidence. (Contestants except.)"

Thereupon the following occurred:

"Mr. Patton: At this time, contestant Rose Roderick asks that all the checks pertaining to her mother's estate

be offered and received in evidence, and that she be given an opportunity to explain each and every check that goes before this jury.

"The Court: I am going to say to you gentlemen that I am going to tell this jury that they are not to consider these checks at all. You are just wasting the time of the court and wasting the time of the jury. I am going to tell them that that don't enter into this controversy. If there is a failure to account for this money, at a proper proceeding and a proper place these parties can account for it. So far as bearing upon this contest, they have no bearing whatsoever."

The subject here involved had been first touched at the close of the contestants' rebuttal by cross-examination of the witness Rose Roderick, as follows:

"Mr. Fagan: The proponents now offer and introduce and read in evidence Exhibits 5 to 45 inclusive, being the checks identified by the witness as being the ones over which she and her brother J. S. Monahan had their trouble, and which checks she says were turned over to her as a part of the cross-examination of this witness, and further, as the checks identified by the witness J. S. Monahan.

"Mr. Patton: Objected to as not cross-examination, incompetent and immaterial, the checks not being properly identified.

"The Court: So far as determining this controversy, I do not think that these checks are material, and for that reason I will sustain the objection to those checks. You have the question of the controversy over them, but the objection to the checks is sustained."

The ruling of the court here indicated is made the basis of an error relied upon for reversal. The argument in support thereof is that the evidence was material, as bearing upon the question whether the daughter Rose Roderick had defrauded or wronged her mother. If she had, this of it-

self would have been a sufficient reason for discriminating against her, and would have rebutted the presumption of undue influence. Much authority is cited and argument devoted to this proposition. We think the argument thus put forward by the appellant is sound. But we think it clear, also, that the argument is not available to the appellant as a ground of reversal. If the introduction of these checks was material to the proof of wrongful administration of her mother's business by the contestant, Rose, their offer should not have been deferred until the surrebuttal of the case. That was a ground of the objection made to it, and it was a sufficient ground for sustaining the ruling of the court. The proponents had closed their main case and the contestants had closed their rebuttal, before this particular question was precipitated at all. At the close of contestants' rebuttal, the proponents had touched the question in the cross-examination of Rose Roderick. The objection made to it there was that it was not cross-examination. It is not claimed now that it was. So that the ruling of the court was, technically at least, correct. But it does appear from some remarks made by the judge to the attorneys that he did not deem the controversy material, and that he would so state to the jury. That this statement by the court indicated an erroneous view may be conceded. Nevertheless, it will be noted from what we have quoted above that the court did not exclude evidence of the controversy or of the merits thereof. The court said:

"You have the question of the controversy over them, but the objection to the checks is sustained."

4. Appeal and error: presentation and reservation of grounds: exceptions: waiver.

The checks are not included in this record, and we have no way of knowing that they would throw any light upon any particular testimony which had been offered. The final ruling of the court was that certain of the checks were admitted.

Thereupon, the contestants asked that *all* the checks be admitted, and that the contestants be permitted to explain them all. The court thereupon made the statement last quoted by us above. It will be noted that he there advised the attorneys of what he proposed to instruct the jury on the subject. He did so instruct the jury in Instruction 18. No exceptions were taken to this instruction by either party. The appellants are therefore foreclosed from now raising such question. The instruction stands as the law of the case.

IV. Complaint is made of the testimony

5. EVIDENCE: opinion evidence: nonexpert witness: insufficient detail of facts: wills.

of certain nonexpert witnesses, on the general ground that there was no proper foundation laid as a basis for their opinions. The first of these is the witness Proctor. He testified to the fact that Mrs. Monahan had been in his office half a dozen times, accompanied by other members of the family. On one occasion, she was there for the purpose of having a land contract of some importance drawn by the witness. Mrs. Roderick and others were with her. The situation was explained by Mrs. Roderick. Proctor asked Mrs. Monahan's approval of the explanation. She said:

"I don't know anything about it. I am too old to do any business, and whatever Mr. and Mrs. Roderick said is all right with me."

Nevertheless, a little later, the witness read to Mrs. Monahan the contract as prepared, and received from her the same statement as before.

It will be conceded that this was a rather meager basis for any opinion of mental unsoundness. But the witness did not express such an opinion. His answer in full was as follows:

"Well, I did not detect that she was of unsound mind in any way. She was an old person, about eighty years old I think, and getting quite feeble; and she admitted, herself,

that she was too old to transact any business, and she did not take any part at all in the business that was transacted in her matters in regard to this contract, and she said that she left everything to Mr. and Mrs. Roderick. So, drawing my conclusion from that, I should think that her mental strength was not sufficient, probably, to go ahead and make the contract."

The foregoing was a mere repetition of what he had already testified to. The only opinion expressed was contained in the last sentence. That was so qualified and inconsequential that it could not be deemed prejudicial, without extreme technicality.

6. EVIDENCE: opinion evidence: nonexpert witness: detail of facts: sufficiency.

The witness Cutler was also examined by the contestants. He was a plumber, and had called at the home, at the request of Mrs. Roderick, to do some plumbing. This included the putting of a sink in the home. He testified:

"I told her Mrs. Roderick had sent me down to make an estimate on some plumbing work, run the water in and put in a sink, and some stuff; and Mrs. Monahan said she didn't known anything about it, and that she was too old to do business, and for me to go over and see Mrs. Roderick. I went over and got Mrs. Roderick, and we talked the matter over, and they showed me where they wanted the fixtures. I took the measurements, and told them that I would make an estimate."

Two or three days later, the witness returned, to do the work. He testified:

"I told Mrs. Monahan I was coming down to do the work, and she wanted to know who ordered me to do it. I told her, Mrs. Roderick. She said, 'All right, if Mrs. Roderick ordered you to do it, go ahead and do it.' She said she didn't know if it was all right to place the sink where we

had talked about. I went over and got Mrs. Roderick, and came back."

He testified further that, while he was doing the work, Mrs. Monahan talked to him continuously about her family troubles, though he was an entire stranger to her. The descriptive facts thus stated by the witness, though by no means conclusive, nor perhaps very persuasive, were yet fairly sufficient to attract attention to her mental condition. The conduct stated was rather out of the ordinary, and was sufficient, we think, to permit the witness to base an opinion thereon.

7. EVIDENCE: opinion evidence: physicians: opinion without detail of facts.
Dr. Sanders was examined as a witness for the contestants. He purported to qualify as an expert. He was a regular practicing physician, and had attended the testatrix as such. He had also been the attending physician of the son Tom in his last illness, and had frequently seen the testatrix during his attendance upon Tom. The following question was put to him:

"Q. Doctor, I will ask you, basing your answer upon your associations with Mrs. Monahan and your conversations with her and your observations of her conduct, the things which she said and your observation of her physical condition and her mental condition, whether or not, during the period covered by your testimony, Mrs. Monahan was of sound mind?

"Mr. Gwin: That is objected to for the reason that the witness is incompetent, and for the further reason that the facts stated by the witness would not warrant a physician or an expert in testifying in the affirmative to the question propounded.

"The Court: I think that is a good objection to that question, Mr. Patton. Are you putting him on here as a nonexpert or an expert?

"Mr. Patton: I qualified him,—I undertook to qualify him as an expert."

The answer was "No." This testimony was further explained on cross-examination as follows:

"Mrs. Monahan did not have a lesion of the brain. I did not make any examination to see. She did not have delusions or hallucinations. What I mean is that her mind was weakened from age or infirmities or sickness, that was all. It was not normal, I don't think. It was just a decline, a breaking up of the tissues, just old age, senility. I could not say as she had it in the worst form. In my experience, I have treated cases or observed cases of senility,—not what you call senile dementia, but just senility alone. Senile dementia is a further advancement of the disease or decay. I don't think she had dementia, but she was more like what we call feeble-minded. I treated her for chronic constipation."

The argument now made by appellant is that the witness, being nonexpert, should not have been permitted to express his opinion of mental unsoundness, inasmuch as he had not stated the facts upon which he based such opinion. As already indicated, the witness purported to qualify as an expert. It is not pointed out in appellant's argument wherein the attempted qualification was deficient. It did appear in the cross-examination that the witness was not a specialist in mental diseases. This would not necessarily destroy his expert character. The boundaries of the field of expert knowledge are somewhat indefinite. There are varying degrees, also, of expert knowledge upon any subject. A regular practicing physician is usually regarded as expert, at least to some extent, and for some purposes. We see no reason to say that he is not qualified, as such, to give an opinion as to the feeble-minded condition of a patient under his care.

It is true that the trial court admitted this testimony

upon a ground that is quite untenable. The court held, in effect, that the question was proper, because it asked the opinion of the witness whether the mind of the testatrix was *sound,* and did not ask whether it was unsound. The theory seemed to be that it would not have been proper to ask this witness for an opinion whether the mind of the testatrix was unsound. Of course, the negative answer of the witness in effect reduced the question to that very form. Naturally, the reason thus given for the ruling is assailed in argument by the appellant. The reason was bad, but the ruling was proper.

The foregoing are the important questions presented for our consideration. The record is voluminous. Many minor alleged errors are assigned and argued. We cannot deal with them in detail without extending our opinion unduly. None of the instructions given by the court were excepted to by appellants, and this meets a number of their assignments of error. A careful consideration of all the errors specified as grounds of reversal satisfies us that none of them can fairly be sustained. The record satisfies us that the trial below was essentially fair, and the verdict is fairly supported by the evidence. The judgment below will, therefore, be—*Affirmed.*

PRESTON, C. J., LADD and SALINGER, JJ., concur.