IN RE ESTATE OF MATHILDA MAIER.

DOROTHY SCHULTZ et al., Appellees, v. MATHILDA NEUMANN et al., Appellants.

No. 46728.

November 13, 1945.

Clark & Clark and Bruce R. Clark, all of Ida Grove, and Cosson, Stevens & Cosson, of Des Moines, for appellants.

E. A. Raun, of Denison, and Reynolds, Meyers & Tan Creti, of Carroll, for appellees.

Mantz, J.— Mathilda Maier, a resident of Ida County, Iowa, died at Ida Grove on March 25, 1943. On March 27, 1943, an instrument purporting to be her last will and testa-

ment was filed in the office of the clerk of the district court in and for said county and offered for probate.

On April 6, 1943, objections to the probate of said purported will were filed by Dorothy Schultz, a niece of deceased and a beneficiary named therein. Later other objectors joined therein.

In brief, the objections were as follows:

(1) That the instrument offered for probate was not legally executed.

(2) That Mathilda Maier lacked testamentary capacity to execute such instrument.

(3) That the instrument was the result of undue influence exercised over Mathilda Maier by Mathilda Neumann and William Neumann, of Ida Grove, Iowa.

Later the issue was submitted to a jury which, on January 4, 1944, returned into court the following verdict:

"We, the jury in the foregoing entitled cause, find for the contestants and set aside the will."

Later proponents moved to set aside the verdict of the jury and the judgment thereon and to grant a new trial. The motion was overruled and the proponents have appealed.

I. The sole issue submitted to the jury was the question of the testamentary capacity of Mathilda Maier to execute the will on February 2, 1937. The two other issues as set forth above were withdrawn by the court and are not involved herein. Other matters presented on this appeal relate principally to the trial procedure, evidence, instructions, and various rulings. However, the main and controlling contention relates to the testamentary capacity of Mathilda Maier. The parties have argued various matters at length, have cited many cases, and have set forth much of the evidence. Will cases are frequent in our legal procedure. The legal principles governing such cases are well settled. Seldom are the facts of any two cases alike. The main difficulty in such cases lies in the application of such legal principles. Quite frequently precedents are of little assistance in deciding such cases. It has long been the holding of this court that where there is a fact question of testamentary capacity, the jury decides such fact question.

After the appellees rested, and before appellants had presented their evidence, appellants moved for a directed verdict, urging that appellees had failed to produce sufficient evidence to show that Mathilda Maier lacked testamentary capacity. This motion was overruled. When all the evidence was received the motion was renewed, with the same ruling.

As above stated, this ruling of the court is urged as the principal error in the court below. By its ruling the trial court held that appellees had introduced sufficient evidence to make a jury question on the issue of the testamentary capacity of Mathilda Maier. In short, the court held that under the record such was a fact question.

The ruling of the trial court in denying the appellants' motions for a directed verdict on the question of the testamentary capacity of Mathilda Maier, and the denial by the court of appellants' motion to set aside the verdict and grant a new trial, require us to take up and consider the record in order to pass upon the correctness of the ruling by the trial court.

Various witnesses were offered by appellees to support their claim that Mathilda Maier lacked testamentary capacity. Before going into the testimony of such witnesses, we deem it advisable to briefly set forth from the record something of the life and activities of Mathilda Maier. This background may be helpful in passing upon the questions in issue.

Mathilda Maier was born in Clinton County, Iowa. She never married. There were seven children in the family, but one of whom, an imbecile brother, was living at her death in 1943. She was seventy-three years old at her death. Her will was drawn on February 2, 1937, at the office of Clark & Clark, attorneys of Ida Grove, Iowa. She lived on a farm in Clinton County, Iowa, most of her life, leaving that county sometime about 1932 and living in the home of a relative at Denison, Iowa, for about a year and a half, later living with another relative in Ida Grove, Iowa, most of the time until her death in 1943. In 1939 she suffered a stroke and from that time until her death was practically helpless. In 1935 and 1936 she went to Omaha, Nebraska, for treatment, and stayed there for some months, part of the time being in a hospital and part with a

relative. While there she was under treatment of Dr. A. E. Bennett, a specialist in mental and nervous diseases. Later she returned to Ida Grove, Iowa, and while there was under treatment of Dr. E. S. Parker of that city. She was quite thrifty and died possessed of considerable real estate, having something like four hundred acres in Clinton County and one hundred sixty acres in Nebraska; also considerable personal property. A large part of her realty holdings had been inherited by her from her father and other deceased relatives. During her later years her property was largely looked after by others. Some years prior to her death her health began to fail and she received medical treatment during most of that period. She was short in stature, was much overweight, and had arteriosclerosis and heart trouble. The cause of her death was arteriosclerosis.

Did the record present a state of facts from which reasonable minds might differ as to what conclusions should be drawn from the facts proven? If we answer this question in the affirmative, then a jury question is presented.

Let us examine the evidence offered by the appellees. Some of appellees' evidence as to the mental unsoundness of Mathilda Maier was given by lay or nonexpert witnesses, while some was given by expert witnesses.

All of the nonexpert witnesses had known decedent for a number of years. She had lived in the homes of some of them for many months. They were in a position to see her, observe her actions and demeanor, and to form an opinion as to her mental condition. Of the six who testified, some were relatives. Each of these witnesses testified to her actions and demeanor and all were of the opinion that she was then a person of unsound mind. The testimony of these witnesses covered a period from 1933 to 1936, the last being shortly before the will was drawn. We will set out some of the testimony of appellees' nonexpert witnesses.

Mrs. A. A. Schember, Clinton, Iowa, had known decedent for a number of years. Decedent stayed in the home of witness in 1933 for about five months; her memory was faulty and she could not remember events of the day; she cried a lot, was incoherent and rambling in her speech; was happy at times,

then sad; these changes might happen several times daily; she could not figure her farm income; she did not have charge of the property; she stayed at the home of witness about five months, having an incompetent brother with her most of the time, and left without paying for the care she and her brother had received. Witness was not a relative of decedent.

Paula Grummer, a niece, after reciting that she had known decedent since childhood and visited with her many times in 1933, testified she found her incoherent in conversations; that she had frequent lapses of memory; talked continuously, repeated things many times; that her mental condition became progressively worse; that she was easily influenced and seemed lacking in will power.

Dorothy Schultz, a niece, of Denison, Iowa, testified that decedent lived in her home in 1933, 1934, and 1935. She testified that decedent was not then looking after her own affairs; that she did things inconsistent with sound mentality, such as smearing honey on her face at night, standing nude in the basement of the home and rubbing herself on a post; that she rambled in her speech, was incoherent, and would repeat the same things over and over; that she would forget names of old friends; would talk to herself, both day and night; that she was subject to decided periods of depression and happiness; she was forgetful; had insomnia; would get lost in town; that she had high blood pressure.

George Schultz, husband of witness Dorothy Schultz, gave testimony along the same lines given by her. He testified that decedent had lived in his home two and one-half years, from April 1933 to October 1935; that she had periods alternating from joy to sadness; she would laugh and sing and then become sad and depressed; that she talked to herself at night when alone; had insomnia and wandered about the house at nights, turning on the lights; that she was rambling, forgetful, repetitious, and talked constantly; that she did abnormal things and ailed a lot; that at times she would remove all her clothing and would rub herself against a post; that she ate moldy bread, spoiled meat, and other spoiled food; that she had delusions that people were trying to get her money.

Lydia Loeck, of Omaha, Nebraska, a niece of testatrix,

testified to certain facts happening when testatrix stayed at her home while she was receiving treatment from Dr. Bennett, shortly before the execution of the will in controversy. Her testimony indicated that testatrix was abnormal in her conduct, rambling in her talk, talked to herself a lot; was incoherent and forgetful; was unclean; was decidedly moody, happy at one moment and sad and tearful the next; she repeated subjects over and over; would not complete conversations; was nervous and had high blood pressure; that she concocted various mixtures, taking part internally and using part externally, and smeared the bedding and furniture; that she was restless and had bowel movements on the floor of the house; that she was ailing and complained constantly of her physical condition.

Mr. Loeck, husband of Lydia Loeck, was in the home while testatrix was there taking treatment. His testimony corroborates that given by his wife and is much in detail. He testified that she was depressed; had daily moods from joy to sadness; that she talked to herself and appeared to be carrying on conversations with others; that she would stand nude in the basement where there was no shower and would rub herself against a post; that she talked a great deal; was restless, nervous, and forgetful, and would be up at all hours of the night; that her conversations were without sense; that she made statements indicating she was infatuated with her doctor.

The appellants objected to the testimony of these witnesses on the ground that the things testified to by each witness did not constitute a basis sufficient to warrant the expression of an opinion by a nonexpert witness and by reason thereof such witnesses were incompetent. The objection to the competency of such witnesses was made and was overruled. We hold that the trial court was right. Campfield v. Rutt, 211 Iowa 1077, 235 N. W. 59; Alvord v. Alvord, 109 Iowa 113, 80 N. W. 306; Denning v. Butcher, 91 Iowa 425, 59 N. W. 69; In re Estate of Goldthorp, 94 Iowa 336, 62 N. W. 845, 58 Am. St. Rep. 400; Ranne v. Hodges, 181 Iowa 162, 162 N. W. 803, and cases there cited. Whether a nonexpert witness has testified to sufficient facts upon which to base an opinion as to mental soundness is primarily a question of law for the court

in the exercise of sound legal discretion. Where a witness is properly allowed to give an opinion its value is for the jury to determine. All of the nonexpert witnesses detailed acts and conduct on the part of testatrix which were inconsistent with sanity, and for that reason could properly express an opinion as to the mental soundness of testatrix. Its weight was for the jury.

In addition to the testimony of the nonexpert witnesses as above set forth, Dr. A. E. Bennett, of Omaha, a specialist in the treatment of nervous and mental diseases, was a witness for appellees. He had specialized in such diseases since 1924 and is an instructor in such subjects in the University of Nebraska. His internship was spent in four hospitals: the Nebraska University Hospital, Philadelphia General Hospital, a hospital connected with the University of Pennsylvania, and the Johns Hopkins Medical School. His testimony was based, to a large extent, upon personal treatment and contacts with testatrix. He treated her in the home of Lydia Loeck and in the Lutheran Hospital at Omaha from October 25, 1935, until April 1, 1936, some months before the will was executed. He diagnosed her condition as manic-depressive psychosis, a major mental disease, stating that it was progressive and there would be no recovery and that unsoundness of mind would exist at all times thereafter; that she had a very depressed mental state; that her condition was chronic, and that she would not have lucid intervals thereafter. He stated that in his opinion testatrix was of unsound mind when he first treated her and when she executed her will in February 1937.

Following her treatment in Omaha, testatrix returned to Ida Grove. Dr. Bennett sent testatrix to Dr. Parker of that city. Dr. Parker had about thirty-five-years' experience. He was a Major in the Army Medical Corps and had had experience in World War I. He disclaimed being a specialist. He stated that he had known testatrix prior to the execution of the will. Following her coming to him for treatment he treated her for two to three years. He detailed her condition, what he observed, and the treatment given; his opinion was that testatrix had arteriosclerosis and high blood pressure and was a person of unsound mind, this opinion being based upon per-

sonal contact and treatment. Certainly Dr. Bennett and Dr. Parker were both competent to express opinions as to the mental condition of testatrix. The opinion of each is based upon personal observation close to the time the will in question was executed. The objections urged by appellants to the testimony of these two physicians were without merit.

Both the expert and nonexpert witnesses gave testimony of other facts and circumstances which might be properly considered as bearing on the testamentary capacity of Mathilda Maier. Some of this testimony dealt with certain angles of her financial dealings, the disposition and whereabouts of certain funds possessed by her. To go into further detail would serve no good purpose.

We have detailed various statements by certain witnesses for appellees in order to show the basis for the opinions as to the testamentary capacity of testatrix. Appellants, in printed argument, make the following statement:

"At the outset we desire to contend that the evidence introduced to establish want of testamentary capacity is frivolous, trivial and without legal weight."

Following a careful reading of the record, we find ourselves unable to agree with this statement. In re Estate of Ensminger, 230 Iowa 80, 296 N. W. 814; Womack v. Horsley, 178 Iowa 1079, 152 N. W. 65; Mileham v. Montagne, 148 Iowa 476, 125 N. W. 664; In re Will of Bever, 93 Iowa 576, 61 N. W. 1072; Philpott v. Jones, 164 Iowa 730, 146 N. W. 859; In re Estate of Grange, 231 Iowa 964, 2 N. W. 2d 635.

As above stated, appellants claim that the court erred in failing to direct a verdict in their favor when appellees rested and also in failing to sustain the motion to set aside the verdict and grant a new trial.

In passing upon these motions, appellees are entitled to have the evidence offered considered in a light most favorable to them. Remer v. Takin Bros. Freight Lines, 227 Iowa 903, 289 N. W. 477; In re Will of Winslow, 146 Iowa 67, 124 N. W. 895, Ann. Cas. 1912B, 663; Janes v. Roach, 228 Iowa 129, 290 N. W. 87; Yance v. Hoskins, 225 Iowa 1108, 281 N. W. 489, 118 A. L. R. 1186; Gowing v. Henry Field Seed Co., 225 Iowa 729, 281 N. W. 281.

We hold that the showing by appellees upon the question of the testamentary capacity of testatrix was such as to require the submission of that matter to the jury.

It is true that appellants introduced much evidence which was directly opposed to that of appellees on the question of the mental capacity of testatrix. Various lay witnesses long acquainted with testatrix gave opinions that at the time the will was executed, also prior thereto and thereafter, she was of sound mind. A medical witness, Dr. Obermann, Superintendent of the State Hospital for the Insane, at Cherokee, Iowa, in a hypothetical question wherein were included many facts and circumstances purporting to appear in the record, was asked to assume such as shown and to then give an opinion as to the mental condition of the testatrix. His answer was that she was of sound mind. Dr. Obermann never saw testatrix; did not even know of her existence.

The evidence on the question of the testamentary capacity of testatrix being in direct conflict and contradiction necessarily required the court to submit that issue to the jury. This court is not trier of the facts. The trial court did not err in ruling that a jury question existed on that issue.

II. · Appellants complain that the trial court erred in giving an instruction [No. 10] wherein the jury was told that in considering the question of testamentary capacity of testatrix: "You may also consider the extent of the testatrix's estate and the financial condition of all those having a claim upon her bounty as the same existed at the time of the making of the instrument * * * ." The specific complaint is that such provision authorized the jury to take into consideration the financial condition of those having claims upon the bounty of testatrix as disclosed by the evidence.

Appellants argue that such a provision is unusual but cite no authority holding that such is improper. In the case of Mileham v. Montagne, supra, this court approved an instruction which had therein a similar provision. See, also, In re Estate of Workman, 174 Iowa 222, 156 N. W. 438; In re Will of Bever, supra; Hardenburgh v. Hardenburgh, 133 Iowa 1, 109 N. W. 1014.

As the instruction criticized was in harmony with our decisions we hold that the trial court did not err in giving it.

■ III. Appellants make complaint of an instruction given by the trial court wherein the jury was told who would inherit from Mathilda Maier in the absence of a will. Such merely stated facts set forth in pleadings which were admitted by both parties. We are unable to see wherein so advising the jury would result in prejudice to either party. There was no error such as is claimed by appellants. See Rosander v. Knee, 222 Iowa 1164, 271 N. W. 292.

■ IV. Likewise, appellants urge as error the giving of Instruction No. 14, as follows:

"You are instructed that mental unsoundness may exist which would render a person incompetent to make a valid will, notwithstanding to all outward appearances she seems to be sane to those with whom she comes in contact, who are not experts upon [such] a question."

The specific objection urged in the exception thereto was that it eliminated from the consideration of the jury the presumption that every person is presumed to be of sound mind, and resulted in placing the burden upon appellants of showing a sound mind on the part of testatrix.

We are unable to agree with appellants on this claim. Instruction No. 5 clearly placed upon appellees the burden of showing by a preponderance of the evidence the lack of testamentary capacity on the part of Mathilda Maier at the time she executed the will.

Instruction No. 7 told the jury that the law presumes all persons to be of sound mind and possessed of testamentary capacity unless shown otherwise by a preponderance of the evidence. Instructions 8 and 9 further emphasize the burden which was cast upon appellees to show lack of testamentary capacity.

In support of appellants' claim of error in giving the above-quoted instruction (No. 14) they cite the case of Byrne v. Byrne, 186 Iowa 345, 172 N. W. 655, a will-contest case. We do not think that case is authority in view of the record

in that case. We think the facts therein and those in the present case clearly distinguish them. We hold that such instruction did not nullify the prior instructions as to the legal presumptions as to testamentary capacity and burden of proof.

Other instructions were objected to and claim made that there was error in giving them. We have considered such claims and find no merit therein.

We might suggest that the instructions in this case, while rather long, fully and fairly deal with the matters involved and set forth correct principles of law to be applied to the facts appearing. Further, such are to be considered as a whole.

■ V. Appellants, as grounds for reversal, cite misconduct on the part of counsel for appellees; also, that the verdict was the result of passion and prejudice on the part of the jury. The appellants' claim (by reference to record) is that counsel for appellees was guilty of misconduct by calling a juror by his first name. Consulting the record, we find that the controversy arose while counsel for appellees (contestants) was making an argument to the jury. The record shows the following:

"Mr. Clark: We object. Proponents object to the statement of counsel. [Addressing Mr. Nicholson, who is one of the jurors.] Mr. Tan Creti: I said do you remember 'Mr. Nicholson that Bruce Clark [attorney for appellants] made such a statement.' I don't know of any rule that I can't call the juror by name. Mr. Clark: There is no question but that it is prejudicial error for any attorney in argument to address any juror by name. The Court: Have you any authority on that? I don't know of any. Mr. Tan Creti: I have always done it. Maybe it is wrong. If you think I should not do it I will refrain from it. The Court: I want you to have all of your rights. Unless you have some authority to submit to sustain that exception I will overrule it. Mr. Clark: Of course, we haven't time to look it up now."

At the time this record was made, Attorney Tan Creti was evidently replying to a statement made in the argument preceding his and was calling attention to something which Attorney Clark had stated therein.

In the printed argument appellants cite no authority to sustain their claim that calling of a juror by name was misconduct. They simply objected to the statement of counsel. This matter was directly called to the attention of the trial court at the time it happened and under the record we do not think that the court abused its discretion in overruling the objection. However, in so holding we do not want to be understood as approving the practice resorted to by some attorneys of addressing individual jurors by name. As a matter of fact, we do not think such practice should be indulged in in the trial of cases. However, under the record no reversible error is shown herein.

As to appellants' claim that the verdict was the result of passion and prejudice, we can see no merit in such claim. Summed up, the jury failed to uphold the will. Naturally, the appellants do not agree with its finding. As we read the record the testamentary capacity of Mathilda Maier to make the will in controversy was the sole issue submitted to the jury. The evidence was in sharp conflict. The instructions correctly set forth the legal principles to be applied. The learned trial court which heard the case ruled against a motion to set aside the verdict and grant a new trial. We think that under the record that ruling was proper. No error being shown, the cause is affirmed.—Affirmed.

All JUSTICES concur.